Good morning, Your Honor. May it please the Court. My name is Robert Allen and I represent the appellants. I intend to reserve three minutes for rebuttal. The District Court erred in three substantive ways in granting summary judgment on whether digital copies of pre-'72 sound recordings are subject to federal law. First, the District Court ignored Section 301 of the Copyright Act when it found that digital copies of pre-'72 sound recordings were subject to federal law even though every sound in every copy at issue embodied only sounds that were initially fixed prior to 1972. Second, the Court erred by applying the wrong tests to determine whether or not a derivative work was authorized and created. Third, even if digital copies of appellants' pre-'72 recordings constituted derivative works, the District Court misapplied Section 103B of the Copyright Act when it found that federal law applied to not only the new materials added but also to the underlying pre-'72 recording. With respect to Section 301, the Court misapplied 301 because Section 301 provides a bright-line test as to whether a sound recording is subject either to state or federal law. If the sounds are initially fixed prior to 1972, they are only subject to state law. The statute says sound recordings, not sounds. That's correct, Your Honor. A sound recording, as defined in Section 101, is the initial fixation of sounds in a tangible medium. So, for example, when Al Green and his band went into the studio and recorded their vocal and instrumental performances, that was the date that the sounds were initially fixed in a tangible medium. That was the demarcation date that you look at when evaluating a sound recording. My understanding is that the sound recording is not the act of recording. It's the fixing on a tangible medium. The sound recording is the intellectual property of the sounds of the performance that are fixed in the tangible medium, and it's different from the tangible copies, phonorecords, or other types of copies that embody the sound recording. But it's fixed in a tangible medium. The tangible medium is the record, no? It's a phonorecord, not the sound recording. It's fixed in a phonorecord, which is defined in the Copyright Act in Section 101, as the physical media in which the sound recording is embodied. So, the initial recording Al Green and his band created prior to 1972, was created prior to 1972. It was a sound recording, pre-'72 sound recording. It went through the remastering process, and they created vinyl records. Later, they went through the remastering process, went back to the original sound recording, and created 8-track tapes. Just what, tape or something? The original sound recording, yes. At the time, it was embodied in 2-inch magnetic tape. And so, when a performer goes into the studio, it's called a multi-track. Every instrument has a different microphone, and it's captured as a different track in the recording. Those tracks are then mixed into a final version, and that final version becomes the master recording, which is the sound recording defined in Section 101. This court in Taxi acknowledges that. Fixation occurs when a complete series of sounds is first produced on a final master recording that is later reproduced in published copies. So, regardless of whether or not those sounds were manipulated after 72, those sounds fixed by Al Green prior to 1972 are pre-'72 recordings. United States versus Taxi. But that's not our case. Yes, it is, Your Honor. Not a district court case? It was affirmed by the Ninth Circuit, and the language that I just read to you was from the appellate court decision on page 965. That reasoning was also conveyed in the Naxos decision in the Second Circuit, where the court held because the original sounds were fixed prior to 1972, any changes to sound quality after 72 made no difference. Those recordings could not be subject to federal law. With respect to the question of whether the digital remastered recordings qualified as a derivative work and qualified for copyright, we're talking about the question of originality and how much originality is contained in the digital remaster, correct? Yes, sir. That's one of the tests. There are two tests in the Durham test, and the district court didn't even address the second problem. Yes. Well, with respect to the first test, I understand that the district court characterized the question before it as followed. It said the question presented whether the sound engineer's remastering of a pre-'72 sound recording through subjectively and artistically altering the work's timber, spatial imagery, sound balance, and loudness range, but otherwise leaving the work unedited, is entitled of federal copyright protection. And the district court concluded that the answer is yes. First question, why are these factors, timber, spatial imagery, sound balance, and loudness range the factors to be considered? They're not, Your Honor. The court applied the wrong test. Where did those factors come from? They were made up by CBS's expert. This is Dr. Begault. Dr. Begault. Yes. But Dr. Begault's testimony or his report, his declaration, as I understand it, referred to those things as relating to the quality of the sound recording. Well, Your Honor. And quality seems to me to be completely different from whether there was something original in terms of the sound recording that might warrant consideration as a derivative work. That it's quality, not originality. That's correct, Your Honor. You're absolutely correct. That is not original. What happened was the same. The object in creating those digital remasters was to try to create something that was as authentic as possible in replicating the original analog recording, correct? That is absolutely correct, Your Honor. And, yes, everybody was interested in improving quality. They wanted to make something that was good, that was clean, but not to change the sound recording. That is absolutely correct, Your Honor. They took the original master recordings and went through the remastering process. And this was all really processed by changing the loudness and equalization, which is really something that is subject to patent law, not copyright law under Section 102. The remasters don't, the digital remasters don't contain any different voices, do they? They do not, Your Honor. Any different musicians? They do not, Your Honor. Any different musical arrangement? They do not, Your Honor. But are you precluding the possibility that there could be a derivative work created through the remastering process if it were sufficiently? I don't know quite what you mean by the sounds aren't changed. Maybe that's because I'm not an audio person. But when you say you adjust the loudness, I understand loudness is supposed to mean something different than volume, but still you adjust the loudness, you adjust whatever the channeling means and so on. And it's the ultimate question whether it is altered in a way that a layperson can hear the difference or what is, are you precluding the possibility that there could be enough of a difference? Well, let me address your first point, which is very important. The test is what the listener can hear, if there are readily distinguishable differences that a layperson, a laylistener can hear. So are you ultimately in this case then suggesting, I thought that your first argument was a legal argument that essentially said this is never going to be a derivative work because of Section 301 and what you're defining as the sound recording. But the other way of looking at it would be that there's at least a factual dispute as to whether there was a derivative work here. So which are you arguing or both? Well, Your Honor raises a very important point because the two questions are completely separate. Whether you have a recording that's a pre-72 recording is a different question and completely distinct from whether there's a derivative work. You can have a derivative work consisting of pre-72 recordings. Let me give you an example. Let's say that you had a band that went into the studio in 1970 and recorded an instrumental track. And then in 1971, you had a vocalist go into the studio and record a vocal performance. But my first question was are you saying that because of Section 301, the remastering process can never lead to a derivative work? Unless the sounds embodied in the new digital copy embody sounds that were initially fixed after 1972. But if the sounds are, I have a hard time because I don't really understand what it means. But what it means to say that you are re-channeling it or that you are changing the loudness, why isn't that changing the sounds? It doesn't change. It's not changing the sounds. It's not adding sounds and it's not adding instrumental or vocal. But why couldn't you in some circumstance change the sounds sufficiently through a remastering process that a lay person would hear something different? I would argue that it would make no difference whether in a remastering you could perhaps remix a recording to add a new track that was recorded after 72 which would then raise the issue about pre-72 versus post-72 in that recording. But if you have a pre-72 recording, nobody went back into the studio and recorded any new sounds. And Section 301 is to provide a bright line test as to when a sound recording is subject to federal law exclusively or state law exclusively. And if the sound engineer somehow made the guitar much louder and the piano much softer, would that not count? No. Without changing any sounds? It would not because the sounds were initially fixed prior to 1972. That's the test. So the third aspect. On your argument, there is no factual dispute and we don't send it back. We just say you should have gotten summary. Did you move for summary judgment, by the way? We did not, Your Honor. This was a motion that the district court requested. So there weren't cross motions, just one? Correct, Your Honor. Can I ask, I'm sorry, I know you want to get to that third piece which I am most interested in actually. But the reason you did not, you're not in a position to get judgment now is because we still have to wait, don't we, for the California Supreme Court to tell us whether you even have a right under state law? Well, our complaint alleges not just that CBS performed the works without authorization, the complaint also alleges that CBS reproduced and distributed our recordings without authorization. And so while the California Supreme Court is going to address whether or not under Section 980 of the Civil Code public performance is included in the exclusive rights, that would not be case dispositive of our case. May I? I'd like to reserve the remaining time for rebuttal. Thank you. Good morning, and may it please the Court. I'm Robert Schwartz for CBS. Ultimately, Your Honors, we believe this case really ends up turning on the construction that the Court gives to Section 301. It presents a borderline situation where you have a work based on a sound recording that was fixed before 1972 that was used to create a new work that was fixed decades after 1972 and is subject to federal law. Now, you have a choice between two different copyright or interpretations of Section 301. You can go with the Bright Line Rule, which counsel actually advocates and the district court went with, which is a sound recording fixed before 1972 is subject to state law, and a sound recording fixed after 1972 is subject exclusively to federal law. Or you can create a hybrid system where that work is governed both by federal law and by up to 50 different state law regimes. But our first question, that's a hard question. The first question is whether there was, in fact, a derivative work. Then let me address that, Your Honor. And I understand him to have two arguments about that. One is essentially close to there never can be when it's just a remastering. And the second is, well, there wasn't in this instance in any event because there wasn't enough of a change. Let me start with your second point, Your Honor, because that is just flat-out contradicted by the record that was undisputed. And I also want to address Judge Lynn's observations or your assumptions, which I believe to be quite erroneous, about the nature of the remastered recordings. I was looking forward to your comment. Thank you, Your Honor. Let me start at a very high level, and this is from the undisputed evidence. It's the testimony from Mr. Inglot, who personally remastered 46 or more of the sound recordings at issue here. These are not, not merely analog to digital transfers as counsel characterized them. That is absolutely false and contrary to the record. What Mr. Inglot does is a weeks and sometimes months-long process of going through and listening to original sound recordings and deciding does this give me what I want to create the personal aesthetic, and that's his term that's quoted in the decision, of a new recording. The purpose of these recordings, Your Honor, is not simply to create something as authentic or clear or clean. That's de-clicking and de-hissing. That's not what we're dealing with here. The purpose of the remastering of these recordings is to create something that sounds completely different so that they can then go out. The appellants in this case or their licensees can go out and sell to the public, hey, if you want to hear the Everly Brothers like you've never heard them before, you need to buy this new remaster. But it's the same sound recording. It is not the same sound recording. It's the same studio performance. But to Judge Berzon's original observation, we're not dealing with performances in this case. We're dealing with works, and works in the sound recording area are works that are fixed. They are recordings that are fixed. Yes, these recordings are based on works that were initially fixed before 1972, but when they were then new works were fixed a second time decades later. That is a very different work. It sounds different. It has different qualities. It doesn't have different musicians. It doesn't have different artists. It doesn't matter, Your Honor. It absolutely doesn't matter. You need to think of this as a painting, in effect, not even a painting, but you need to think of this as a work of art that somebody wants to make changes to. And, again, this is undisputed even from appellant's own expert. Let's take a painting because that's interesting. You have the Mona Lisa, and it's copyrighted for some reason. And it's very dirty, right? It's very dirty, yes. And you get someone to basically restore it. And so it's a very, you know, skilled process, and it's going to look quite different when it's finished. I mean, you've seen these paintings when they're— So the area, I can actually see them here. My next question is can anybody actually, can a layperson hear it? But putting that aside for now, I suppose you really could see it with the Mona Lisa. Is that a new work? Well, if the objective is simply to clean off dirt, then I would analogize that. Then I would say no because— Well, except that it's not. I mean, in fact, then they repaint things and they— Well, then now we're introducing creative expression. The people who did it are certainly highly skilled, and some will do it better and differently than others, whether it's creative. I mean, it may be original in the sense that it's required for a copyright. I don't know. Well, can I attempt to answer your question? Because I think if the objective is to create a different-looking Mona Lisa, and there is an application of creative expression in order to do that that involves more than the sound equivalent of just taking out hiss, that is to say just removing grime, but somebody says, you know, there was an important thing in the background of that painting that meant a lot to the people who were viewing the painting. There was the Madonna, and nobody ever saw it, and I wanted to bring it out. That's what sound engineers do. They say, you know what? I want people to hear the bass line more, or I want them to hear the background singers more. That is creative expression, and that is sufficient under Section 101 and under the case law, certainly under Feist and Ticini and Maljak, that kind of changing of the sound is sufficient to create a new work that is subject to copyright. That's the minimum. I'm sorry. Should we worry about what the copyright circulars say and the fact that there's been change recently? No, you don't need to worry about that for a couple of reasons. One, the copyright circular did not suddenly say, oh, remasters are not sufficiently different. Well, it came pretty close because it took out the example. We don't know why they removed it, Your Honor, and they certainly did not take a position that says these are not works and that these are not eligible for protection as derivative works. Plus, I do want to point out the appellants themselves told the court that the circular was entitled to no weight when the circular was not, obviously, something they could construe in their favor. But the important thing about the circular, Your Honor, is it absolutely does not take an affirmative position that says here are the things that do not constitute sufficient changes, like declicking and making an analog to digital transfer, and also remastering the recording. What it did continue to maintain is that if you change the sounds, that does qualify as a derivative work. And that's what happened here. Your Honor, I think it's very important on this record that we adhere to the undisputed facts that there were significant changes. What Mr. Galuso was talking about, excuse me, Dr. Begalt, in his four methods was a discussion of the timber. And let me talk about timber. What is timber? But he characterized those as issues relating to improving sound quality. Well, what he's talking about, I don't think that's right. What he's talking about is saying, look. That's what he said. But he's not denigrating the artistic result, Your Honor. I'm not trying to. No, no. Reinterpret it. He said, you know, aesthetic decisions made by a mastering engineer are complex and interrelated and have to do with the overall sound quality of a recording. Yes. I think you may be thinking of quality in a different way than he is thinking about it. You're thinking of it the way the plaintiffs, in this case, have characterized this, which is you took a vinyl record, an analog record, and you simply ran it through a computer and made it into a digital recording. Actually, what we were just told is that you didn't take the record. You took a tape from which the record was originally made. We took the tape. That is correct, Your Honor. What the recording engineers do, the remastering engineers do, is they go and they hunt through the archives and look for different tapes from which those original records were made. And they say, hey, I can remaster this at over 4,000 different levels of frequency to emphasize some sounds, to de-emphasize other sounds, and to move so that now the backup singers are here and the lead vocalist is over here, and I can make, through the application of aesthetic and creative choices, a recording that sounds different and that, in fact, the appellants have made money on based on the fact that... I would assume, and this is an assumption, that they can do that or they cannot do it with regard, when they're trying to change something to a digital... from an old-fashioned vinyl record to a digital system, they could do all that, and they could also pretty much leave the actual sounds as they are, and it wouldn't be a case... This ultimately gets to the question of is summary judgment appropriate here. All right. And it is... Is the standard what a layperson would hear, and couldn't it vary a lot from one recording to another? I don't know if the standard is, frankly, what a layperson would hear. The real standard under Section 101 and under Feist from the Supreme Court is did the creator of the new work apply sufficient expression, significant artistic creativity to make a difference. It's a very low threshold. Now, that's the standard, and these works on the undisputed record meet that standard. But to your point, it also happens to be the case that people could hear the difference, and we put that into the record where people were saying, wow, you can hear the Everly Brothers or Al Green in ways you never heard before. So if that were the standard, which I don't think it is, it was met here. Again, undisputed evidence. Now, let's talk about summary judgment and whether it was appropriate here. Your Honors, in some cases, maybe it's not. But not in this case. As the nonmoving party opposing summary judgment, it was the appellants in this case had the opportunity and indeed the duty to put forward admissible evidence to create triable issues of fact on the changes to these recordings. If they wanted to say, for example, that the changes that were made were insufficient for purposes of satisfying the minimum standard of creativity, they could have put that evidence in. If they wanted to say, for example, that this recording or that recording really wasn't sufficiently changed, they could have done it. They didn't do it. And the reason they didn't do it is because it would have made it impossible to certify this as a class action, which was their ultimate objective. If we had to go recording, record by record, to make that determination, there would never be a class. They knew that. They can't go back on that again. Can you address their argument? Do you have more to say on this point? I wanted to move to 103. What's that? I wanted to move to Section 103, Your Honor, because I know that's of interest to you. But I'll answer whatever questions you have. I guess I came in on the assumption, I want you to tell me if I've been steered in the wrong direction in my own thinking, that it doesn't really matter whether these are derivative works or not. We can assume that they are and give your client the benefit of the doubt on that. But the plaintiffs are still right, that even if they're treated as derivative works, you still would have to get authorization to use the underlying work from which the remastered recording is derived. And that seems to me completely right from the standpoint of just basic background principles. First of all, all of these recordings, they authorized them. So they did give permission to create these recordings. What they're now complaining about is the legal consequence of that as a derivative work that's been created that qualifies for protection under federal law. They're suddenly saying, oh, well, their lawyers are saying, I mean, we didn't intend that. But the protection that this work is afforded. Roberts. They didn't authorize you. Let's assume that there's this public performance, right? They didn't authorize you all to publicly perform. So that's what they're, that's the assertion, right, that there's still this core set of rights for the underlying work that they never licensed you to use. So that really is a Section 301 issue, not a 103 issue, Your Honor. And that's the question I started with is, what, how are you going to interpret Section 301? Are you going to say that, no, even though Congress, if you go back and look at the legislative history of the statute, said very explicitly in 301, we want to do away with dual and archaic regimes. They create conflicts between state and federal law. We want a bright line. Now, what the appellants are saying is, no, let's keep it muddy. Let's, even though they say they want a bright line. Well, let's go to 103. I mean, don't you need to go to 103 to answer, to inform how are you going to read 301? Because 103 does seem to suggest a non-merger regime, right? The original work is still there. Well, it may be there, Your Honor, but all 103 tells us is what is the scope of the copyright in the new work. And that's there for very different reasons. 103 has nothing to do with drawing a boundary between state and federal law. So your argument is that 301 is essentially an override to 103 in the sense that because it is treating the sound recording that is subject to the time change is the combination of the original work and the derivative work. Once you switch over, even though there's still a derivative work for copyright purposes in terms of which regime governs its post-72. So, for example, you would assume that the licensing scheme, the post-72 licensing scheme does apply to the original sound recording. For digital distribute. Well, there is no post, there is no. I thought there is for some purposes and not others. For digital distribution of post-72 sound recordings, not for pre-72 sound recordings. And we are in compliance for these works. You're saying there's a post-72 sound recording. Yes. Are you saying that the original work is not there anymore and doesn't have to be licensed or is that it has to be licensed under the post-72 regime? Post-72 regime. But it does have to be licensed. For terrestrial, no, because there's an exemption. For digital, yes, and CBS complies with it. So your understanding is that 103 still operates, i.e., there still is an original work out there that does have to be licensed, if it has to be licensed, but it has to be licensed under the post-72 regime. Is that what you're saying? If I understand your question correctly, Your Honor, and if I can just answer it. For purposes, we believe what CBS broadcasts were post-72 derivative works subject to federal copyright and, therefore, must comply with the congressional regime for post-72 sound recordings. We do not need a license under state law. That would be contrary not only to the congressional intention, but every case this circuit has had and other cases where there has been an overlap between federal and state regimes, every time this Court has said, bright line, even though there may be a state law right in that work, we're dealing with the same rights to exploit the same work, it's going to be governed exclusively by federal law. That's been true in the idea submission case. That was for all of the courts. What's that? I can't hear you. They were all different circumstances. Well, and I'll acknowledge, Your Honor, there is no case directly on point in terms of how you interpret Section 301. It's kind of amazing because this has been going on for quite a while. Well, it is, but the principles are still there. Congress's intent for a bright line rule between pre-72 fixed recordings and post-72 fixed recordings, this Court's decision in Mons, T3, Sony v. Laws v. Sony, every time someone has tried to say I should be able to assert a state law right in a derivative work subject to federal copyright law, this Court has said, no, you can't do it. It's preempted. Why? Because we are not going to have two competing regimes. Congress was very clear. We do not want to have state law rights and federal. But the problem, of course, here is that we do have two competing regimes. We have a pre-72 and a post-72, and that's different from all these other circumstances. Well. There are two competing regimes. But Congress doesn't want that. So the question is do you want to adopt? Well, we don't want that. We need to figure out. Do you want to adopt? I'm sorry. I'm sorry, Your Honor. That's the problem because in all the other instances there isn't a recognition of two regimes. But here there is a recognition of two regimes, and the question is which one are we in? Oh, no, no, Your Honor. There's absolutely a recognition of two regimes. The law of ideas is recognized in the Copyright Act as subject to state law. But let me just illustrate one consequence of what the appellants are suggesting in this case. Let's say I'm a record company, and I'm about to release a big new Taylor Swift recording. But I want radio stations to have to pay me to play it. Under their interpretation, all I have to do is insert a three-second excerpt sample from a pre-72 sound recording, and boom, the terrestrial exemption no longer applies, the compulsory license no longer applies. That is completely contrary to what Congress intended. It's completely contrary to what the Second Circuit did in interpreting the confluence or application of pre-72 sound recordings under the DMCA safe harbor. And it is contrary to every decision you've made in dealing with the interplay between state law and Federal law. Congress does not want this morass, this mess, and the district court correctly decided to avoid it, and we urge this Court to affirm that. Okay. Thank you very much. Your time is up. We will give you some time. How much time do you have? One hour. We'll give him an extra minute because he took some extra time, so put an extra minute on it. Thank you. Thank you, Your Honor. First off, I want to bring to the Court's attention that appellees admit that the pre-72 recordings are embedded in the new recordings, in the new digital copies at issue in this case. Also, the district court relied upon Circular 56 in coming to its conclusion that the changes made to the derivative works were, in fact, substantive, readily identifiable. But nobody listened to it. The argument, I gather, is that the sound recordings that are referred to in Section 301 are unitary. In other words, it's not that once they jump the line, you don't preserve the original work for the purpose of licensing, but that in 301 if you have a sound recording that is in any sense new, and you never got to this point because we were only arguing on the assumption that it wasn't a derivative work. But if it is a derivative work, their argument is that for purposes of whether or not it's the pre-72 or the post-72 regime that applies, it's the post-72 regime that applies. So what about that? That is completely wrong, Your Honor. The U.S. Supreme Court in Aben made it very clear. Well, Aben is, it seems to me, off for several reasons, the biggest one being that the whole problem there was that the original work was no longer licensed, right? Well, but it didn't make a difference. The relevant point from Stewart was that because the original work was on loan in the derivative work, you had to look at the rights of the original work as well as the new elements. That was codified in 103. And the case that I'd also like to bring to this Court's attention is that. But neither of those solved the statutory problem of what Congress meant in 301, which is a unique statute, when it said that the sound recording, when it drew this line between the pre-72 and post-72 sound recordings. I mean, you're arguing for a single, for a regime that says, if the original work is still copyrighted and copyrightable, then it is subject to the pre-72 regime. They are arguing, as I understand it, that the original work is still copyrighted and copyrightable, but under the post-72 regime because it's in a post-72 sound recording. That's correct, Your Honor. If I could refer you to the Ninth Circuit case of Russell v. Price, that involved a motion picture, Pygmalion, that embodied the screenplay by Bernard Shaw. Even though the movie entered the public domain, the heirs of Bernard Shaw were allowed to exercise their rights, to enforce the rights in the underlying work. So it didn't make a difference what happened to the new elements in the derivative work. It only matters what happens to each element. You've heard your opponent say that Congress absolutely did not want this dual regime. I agree with Judge Berzon. I'm not sure that it's that clear from the statute that we have before us that that's true, but what's your best response to that? Your Honor, if CBS has a problem with the statute, they should talk to Congress. Section 301 is very clear. If it was initially fixed prior to the sound recording was initially fixed prior to 1972, it can only be subject to state law. If it was initially fixed after 72, it's subject to federal law. And there has been no new fixation of sounds. No one went back in the studio. No one sang any new songs. The question of whether there's a derivative work. Let's assume for the purposes of this discussion that there is a derivative work, okay, or another way to look at it, there's a new sound recording, which includes the old sound recording sufficiently for the old sound recording's copyright interest to continue. Correct, Your Honor. In that instance under Section 103B, the federal copyright would apply and only apply to the new material. And the second part of 103B says that the copyright has to be independent of and cannot affect the rights and the underlying work. I know, but just what I asked, what I'm hoping you can respond to is why in the world would Congress have intended this regime to come into being? Because I have to say I agree with CBS. It doesn't make a whole lot of sense. This isn't a very efficient regime to have created, if that's what Congress intended. I guess I'm just trying to get you to say, why would it have made sense for people drawing on a clean slate to say, yeah, let's have this regime where there are going to be these two totally different sets of laws that govern the same work? I realize that it's problematic and that perhaps in the new iteration of the Copyright Act they will address this. But as the Copyright Act is written now between Sections 301 and 103, there's no case that CBS has pointed to. I know. But so is your response just basically that maybe Congress didn't really think this through, but, hey, you, the court, you're stuck with the plain language and so just apply it? Or are you saying that, no, actually, somebody rationally thinking through this at the outset would have said, yeah, this is a great idea, let's create this. I think Congress was trying to create a demarcation point of when sound recordings, which were newly covering under copyright, federal copyright, would be subject to federal copyright law. They decided that would be the date of initial fixation of February 15, 1972. Should they have made it retroactive? Maybe. But that's not what they did. They said February 15, 1972, that's the date. And all of the cases that have addressed whether recordings are pre-'72 or post-'72, and I've only found three, including Naxos, Taxi, and the District Court decision in Fantasy versus LaFace Records. By the way, Taxi is cited in your brief as a District Court case. I can't find it. It is, Your Honor. I'm happy to give you the cites from the Paginar brief. It's also in the reply brief. Taxi was a District Court decision affirmed by the Ninth Circuit, and the language that I quoted to you today was from Paginar. Is it affirmed in an unpublished decision? No, it's published, Your Honor. I'm sorry. It was published. You don't cite it in your opening brief. You only cite the District Court opinion. I believe it's in the reply brief, Your Honor. And one other point, if I could make quickly, is that all of the appellants testified at deposition that they did not authorize the creation of derivative works. They only authorized the reproduction and distribution. And if I could just refer you to those pages in the record, ER 149-153, 168-176, 193-204, and 214-238. Thank you, Your Honor. One last question. Do you think you have, if this isn't a question to be answered statutorily, do you have enough evidence in the record to create a disputed material fact with regard to whether there was a derivative work? Absolutely, Your Honor. What is it? Well, the test, the Durham test, requires a showing that there are substantial, readily distinguishable differences. Even CBS acknowledges from Schrock the standard readily distinguishable differences. All the evidence that was presented in this case was Dr. Pagot using his computer to determine differences that were inaudible, that included changes that were inaudible to the human ear. One decibel of difference in sound. All right. But you don't have anybody, you have no record of somebody listening to these records and saying, I can't tell the difference. All the appellants did. They provided deposition in the citation I just provided to you, that for their recordings, for all of the remastered works, they heard the exact same recordings, that there were no changes to equalization that they heard where it changed it in any meaningful way. The parties themselves. The parties themselves. And your expert was disallowed. Partially disallowed, yes. And you don't have any person who listened to these records and said they're the same. The appellants listened to them and they said that they were the same. And one other point with Mr. Inglot, his employer, Rhino Records, we had a declaration from the head of business affairs, who handled all the licensing, who confirmed that they were not authorized to make any substantive changes. They were not authorized to create derivative works. All right. Thank you very much. Thank you, Your Honor. Very useful arguments. ABS Entertainment versus CBS Corp. We'll go to Jones versus AB Acquisition.
judges: Berzon, Watford, Linn